IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

LILIA Q. RYAN,

       Plaintiff,

v.

DELAWARE PARK MANAGEMENT
COMPANY LLC,

       Defendant.

Civil Action No. 22-949-RGA

## MEMORANDUM OPINION

Kate Butler, KATE BUTLER LAW, LLC, Wilmington, DE,

    Attorney for Plaintiff.

Jennifer Gimler Brady, Carla M. Jones, POTTER ANDERSON & CORROON LLP, Wilmington, DE,

    Attorneys for Defendant.

May 30, 2025

ANDREWS, U.S. DISTRICT JUDGE:

Before me is Defendant's motion for summary judgment. (D.I. 56). I have considered the parties' briefing. (D.I. 57, 60, 64). For the reasons explained below, Defendant's motion is GRANTED in part and DENIED in part.

I. BACKGROUND

Plaintiff Lilia Q. Ryan is employed by Defendant Delaware Park. (D.I. 57 at 1). Delaware Park is an "entertainment venue" with, among other things, a casino. (*Id.* at 3). Ryan has worked as a table games dealer in the casino since 2016. (*Id.*). Ryan has lodged several complaints against her colleagues and employer. (*Id.* at 4).

Ryan filed a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC") and the Delaware Department of Labor ("DDOL") on July 22, 2019, alleging discrimination based on sex, national origin, and age. (D.I. 60 at 1). That Charge is generally not at issue in this case.

On November 10, 2019, Ryan complained to Assistant Shift Manager Leo Williams that another Dealer called her a "black widow." (D.I. 57 at 4). Ryan completed an internal incident report and indicated in the report that she heard the words "black widow," but did not indicate who said it. (D.I. 59-1 at 7 of 61). Williams also completed an incident report and indicated that Ryan said Dealer Ray Burns called her a "black widow." (*Id.* at 9 of 61). In her deposition, Ryan alleged that assistant shift manager Evern Bayard and dealer Ray Burns were the ones that called her a "black widow." (D.I. 60-1 at 7 of 66).

On January 11, 2021, when Ryan was working at a table, floor supervisor Anthony Ruggeri touched Ryan's hand. (D.I. 59-1 at 19 of 61). On January 12, 2021, again when Ryan was working at table, Bayard touched Ryan's hand and said his hands were cold. (*Id.*). Ryan

2

complained to shift manager Robert Hennefer on January 13, 2021, and then completed an incident report at Hennefer's suggestion. (*Id.* at 19, 21 of 61). Ruggeri and Bayard received written warnings. (*Id.* at 26, 28 of 61). Delaware Park Human Resources met with Ryan about the incident. (*Id.* at 30 of 61). Ruggeri and Bayard did not touch Ryan on the hand again. (D.I. 64 at 3).

On July 5, 2021, Ryan, floor supervisor Suyun Jiang, and shift manager Lura Price signed off on a table inventory slip, which is a required accounting of the number of chips at a table at the end of a shift. (D.I. 57 at 5). Delaware Park requires the outgoing dealer, floor supervisor, and shift manager to sign the inventory slip. (*Id.* at 6). If there is a discrepancy between a slip count and the actual count on the table, Delaware Park's Audit Department will issue an Audit Notice to the employees that signed the inventory slip. (*Id.*). According to Delaware Park, "An Audit Notice is a routine, non-disciplinary document intended only to educate Table Games staff on compliance with [Minimum Internal Control Standards]." (*Id.*). Ryan says she and Jiang correctly counted and recorded the number of chips on July 5, but Price changed the number and issued a new inventory slip. (D.I. 60 at 2). Ryan said she protested the change but signed the new slip because she feared the consequences of disagreeing with Price. (*Id.* at 2–3). Delaware Park later issued audit notices to Ryan, Jiang, and Price. (D.I. 64 at 7–8).

On July 6, 2021, Ryan submitted a Charge of Discrimination with the EEOC based on the dispute over the chip count. (D.I. 1-1 at 17–18 of 18; *see* D.I. 60 at 3).

On July 19, 2021, Delaware Park issued Ryan an Employee Counseling Notice, alleging Ryan called out from work several days earlier without proper notice. (D.I. 60-1 at 57 of 66; D.I. 60 at 3). Ryan claims she timely called out from work. (D.I. 60 at 3). The Employee Counseling Notice form has a "Disciplinary Action" section with five potential boxes to check:

3

"Verbal Warning," "1st Written Warning," "2nd Written Warning," "Final Written Warning," and "Termination." (D.I. 60-1 at 57 of 66). "Verbal Warning" is checked on the July 19th Notice. (*Id.*).

On July 28, 2021, Delaware Park issued Ryan an Audit Notice for the July 5th chip discrepancy. (D.I. 60 at 3). Assistant shift manager Jaimie Kelly met with Ryan and gave Ryan the Audit Notice. (D.I. 57 at 6). Supervisor Deann Fox, who witnessed part of the exchange between Kelly and Ryan, said Ryan was "disrespectful" and "aggressive." (*Id.*). Ryan admitted she acted aggressively. (D.I. 59-2 at 13–15 of 84).

Later on July 28, Ryan went to speak with Jiang, who was working at a blackjack table on the floor, about the Audit Notice. (D.I. 60 at 3). Jiang had customers at the table. (D.I. 57 at 6). Jiang turned her body to talk to Ryan. (*Id.*).

On August 12, 2021, Delaware Park issued Ryan a Written Warning (or a second Employee Counseling Notice) for disrupting Jiang's game. (D.I. 57 at 7; D.I. 59-1 at 50 of 61). This time, "1st Written Warning" was checked in the "Disciplinary Action" section. (D.I. 59-1 at 50 of 61). Jiang also received a warning; hers had "Verbal Warning" checked in the "Disciplinary Action" section. (*Id.* at 52 of 61).

On August 13, 2021, Ryan received a non-disciplinary Advisory Note to File about her behavior towards Kelly during the July 28 meeting. (*Id.* at 54 of 61; D.I. 60 at 3).

All three writings (Employee Counseling Notice, Written Warning, and Advisory Note) say, near the top, "This is an advisory note. Future infractions or failure to improve may result in disciplinary action up to and including discharge." (D.I. 60-1 at 57 of 66; D.I. 59-1 at 50, 54 of 61).

4

Ryan remains employed and in good standing with Delaware Park. (D.I. 57 at 7). Ryan filed the instant lawsuit, *pro se*, on July 19, 2022, alleging harassment, retaliation, and discrimination based on several protected characteristics. (D.I. 1 at 1–2). Delaware Park moved to dismiss Park's claims, which I granted in part and denied in part. (D.I. 19). Ryan has since retained counsel. (D.I. 35). Ryan voluntarily waives some of the claims originally alleged in her complaint. (D.I. 60 at 17). Two claims remain, both of which are under Title VII: (1) hostile work environment due to sex discrimination and (2) retaliation. (*Id.* at 4, 10). Delaware Park moves for summary judgment on both. (D.I. 56).

## II.   LEGAL STANDARD

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). The moving party has the initial burden of proving the absence of a genuinely disputed material fact relative to the claims in question. *Celotex Corp. v. Catrett*, 477 U.S. 317, 330 (1986). Material facts are those "that could affect the outcome" of the proceeding. *Lamont v. New Jersey*, 637 F.3d 177, 181 (3d Cir. 2011) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). "[A] dispute about a material fact is 'genuine' if the evidence is sufficient to permit a reasonable jury to return a verdict for the nonmoving party." *Id.* The burden on the moving party may be discharged by pointing out to the district court that there is an absence of evidence supporting the non-moving party's case. *Celotex*, 477 U.S. at 323.

The burden then shifts to the non-movant to demonstrate the existence of a genuine issue for trial. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986); *Williams v. Borough of West Chester*, 891 F.2d 458, 460–61 (3d Cir. 1989). A non-moving party asserting that a fact is genuinely disputed must support such an assertion by: "(A) citing to

particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . , admissions, interrogatory answers, or other materials; or (B) showing that the materials cited [by the opposing party] do not establish the absence . . . of a genuine dispute . . . ." FED. R. CIV. P. 56(c)(1). The non-moving party's evidence "must amount to more than a scintilla, but may amount to less (in the evaluation of the court) than a preponderance." *Williams*, 891 F.2d at 460–61.

When determining whether a genuine issue of material fact exists, the court must view the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in that party's favor. *Scott v. Harris*, 550 U.S. 372, 380 (2007); *Wishkin v. Potter*, 476 F.3d 180, 184 (3d Cir. 2007). If the non-moving party fails to make a sufficient showing on an essential element of its case with respect to which it has the burden of proof, the moving party is entitled to judgment as a matter of law. *See Celotex Corp.*, 477 U.S. at 322.

### III.  DISCUSSION

#### A. Hostile Work Environment

Title VII prohibits sexual harassment that is "sufficiently severe or pervasive to alter the conditions of [the plaintiff's] employment and create an abusive working environment." *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 67 (1986). To succeed on such a claim, Ryan must prove: "1) [she] suffered intentional discrimination because of [her] sex, 2) the discrimination was severe or pervasive, 3) the discrimination detrimentally affected [her], 4) the discrimination would detrimentally affect a reasonable person in like circumstances, and 5) the existence of *respondeat superior* liability." *Mandel v. M&Q Packaging Corp.*, 706 F.3d 157, 167 (3d Cir. 2013). "To determine whether an environment is hostile, a court must consider the totality of the circumstances, including 'the frequency of the discriminatory conduct; its severity; whether it is

physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.'" *Id.* at 168 (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 23 (1993)).

### 1. Intentional Discrimination Because of Sex

Ryan argues that Ruggeri and Bayard touching her hand and Bayard referring to Ryan as a "black widow" were discriminatory acts based on her sex.[1] (D.I. 60 at 4–5). Ryan argues a jury could reasonably determine the two men would not have touched a male dealer's hand, and that "it does not require a degree in entomology to know that a similarly situated male dealer would not be referred to as a 'black widow.'" (*Id.* at 5). Delaware Park argues "the record is devoid of any factual allegations connecting [Ryan's] allegations to any protected classification." (D.I. 64 at 2).

"To show intentional discrimination based on sex, the plaintiff must demonstrate that gender is a substantial factor in the discrimination, and that if she had been a man, she would not have been treated the same." *Kulp v. Norfolk S. Ry. Co.*, 2024 WL 4665185, at *3 (M.D. Pa. Nov. 4, 2024) (citing *Tomkins v. Pub. Serv. & Elec. Gas Co.*, 568 F.2d 1044, 1047 (3d Cir. 1977)). "[S]ex-specific and derogatory terms" can "make it clear" that the discrimination is based on sex; so can "evidence about how the alleged harasser treated members of both sexes in a mixed-sex workplace." *Oncale v. Sundowner Offshore Servs.*, 523 U.S. 75, 80–81 (1998).

Viewing the evidence in the light most favorable to Ryan, the "black widow" comments and hand touches could be intentional discrimination based on her sex. A reasonable jury could very well decide that Bayard would not call a man a "black widow," primarily due to the

---

[1] The parties do not address Ryan's allegation that dealer Burns also called her a "black widow." I will thus analyze only the conduct of Bayard and Ruggeri.

7

gendered nature of the term, and that Bayard and Ruggeri would not touch a male dealer on the hand. *See Oncale*, 523 U.S. at 80.

### 2. Severe or Pervasive Discrimination

Ryan argues the hand touches and name calling were pervasive. (D.I. 60 at 5–6). Ryan testified at her deposition that Ruggeri had touched her many times previously, but she did not report it because she did not want "to escalate the situation." (D.I. 59-2 at 18 of 84).

Delaware Park argues Ryan failed to offer evidence of discrimination that was sufficiently severe or pervasive. (D.I. 64 at 2).

I think there is a sufficient dispute of material fact that renders summary judgment on this element not appropriate. Both the frequency and the severity of conduct must be evaluated. *Faragher v. City of Boca Raton*, 524 U.S. 775, 787–88 (1998). "[S]imple teasing, . . . offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment." *Id.* at 788 (internal quotations and citation omitted). Ryan alleges Ruggeri grabbed her hand "many, many times" and "[i]t was a habitual thing that [Ruggeri and Bayard were] doing." (D.I. 60-1 at 14, 18 of 66). Delaware Park disputes this. The frequency of the alleged conduct is material in determining whether the conduct rises to the level of being severe or pervasive. *Faragher*, 524 U.S. at 787–88.

Delaware Park argues that Ryan's only support is a self-serving deposition, but cites no case to show deposition testimony is insufficient to create an issue of material fact. (D.I. 64 at 2–3). Indeed, self-serving deposition testimony can create an issue of material fact to defeat summary judgment. *See Paladino v. Newsome*, 885 F.3d 203, 209 (3d Cir. 2018). Though Ryan offered virtually no details in her deposition about the exact frequency and nature of Ruggeri and

8

Bayard's purportedly repeated conduct, I note that Delaware Park has offered no sworn testimony to counter Ryan's claim.

Though Ryan alleges in her brief that the name-calling was persistent, in her deposition she identified only two times when Bayard called her a "black widow." (D.I. 60 at 6; D.I. 60-1 at 19–20 of 66). I note that that alone is not severe or pervasive. *See Nitkin v. Main Line Health*, 67 F.4th 565, 571 (3d Cir. 2023). Nor do I think those two instances of name calling were part of a pattern of discrimination. *See O'Connor v. City of Newark*, 440 F.3d 125, 127 (3d Cir. 2006). But since Ryan testified that Ruggeri touched her hand "many, many times" (D.I. 59-2 at 18 of 84), Ryan has created an issue of material fact on the pervasiveness of the alleged discrimination (that is, the hand touching).

### 3. Detrimental Effect

Ryan argues she was detrimentally affected, pointing to her deposition testimony where she said she "was broken" and "walk[ed] out on the job" several times. (D.I. 60 at 7).

Delaware Park argues Ryan was not detrimentally affected, pointing to the fact that she never reported that Ruggeri or Bayard called her a "black widow" and made one complaint about unwanted touching. (D.I. 64 at 4).

A reasonable jury could conclude Ryan was detrimentally affected. The bar for detrimental effect is low. *See Abramson v. William Paterson Coll.*, 260 F.3d 265, 280 (3d Cir. 2001) (finding detrimental effect based on the plaintiff's coworkers' declarations, including a coworker saying plaintiff felt "like a broken puppy," "became sallow, stooped, [and] . . . looked broken").

Ryan testified that she "was broken" and "walk[ed] out on the job" at least in part due to Bayard grabbing her hand. (D.I. 60-1 at 13 of 66). Ryan said she "was suffering" as a result of

9

the on-going hand grabbing. (*Id.* at 14–15 of 66). She alleges being called a "black widow" was a traumatic experience that she found "very offensive," leaving her crying and upset. (*Id.* at 7, 8 of 66). This is enough to support detrimental effect.

### 4. Detrimental Effect to a Reasonable Person

Ryan argues a reasonable woman would find the term "black widow" pejorative and that a jury should decide whether a reasonable woman in Ryan's place would be detrimentally affected. (D.I. 60 at 7–8). Delaware Park argues no reasonable person would be detrimentally affected. (D.I. 64 at 4).

The reasonableness of a detrimental effect is very similar to the inquiry for severe or pervasive conduct. *See Abramson*, 260 F.3d at 280. For the same reasons I explain above with respect to the severe or pervasive element, I think there are disputes of material fact about this element.

### 5. Respondeat Superior Liability

Ryan argues Delaware Park is liable for the actions of Ruggeri and Bayard, and any alleged affirmative defense should be left to the jury because there are disputes of fact. (D.I. 60 at 8–9). Delaware Park argues it should not be liable for the actions of Ruggeri and Bayard because it exercised reasonable care in addressing Ryan's complaints. (D.I. 57 at 17–18; D.I. 64 at 5).

The standard for *respondeat superior* liability depends on whether the alleged offender is the plaintiff's co-worker or supervisor. Ryan alleges Ruggeri and Bayard are her supervisors, pointing to testimony from Hennefer describing Ruggeri as "a dual rate dealer/supervisor" and Bayard as "a pit/assistant shift manager." (D.I. 60 at 8–9). Ryan points to authority in both men's job descriptions and argues, "[Ruggeri and Bayard's] apparent authority to hire and to

discipline is sufficient to meet the tangible employment action standard such that Ruggeri and Bayard were supervisors within the meaning of *respondeat superior* liability." (*Id.* at 9) (citing *Moody v. Atl. City Bd. of Educ.*, 870 F.3d 206, 217 n.14 (3d Cir. 2017)). Delaware Park makes no argument to the contrary, but proffers law on *respondeat superior* liability of coworkers' actions. (D.I. 64 at 5). Ryan has created a dispute of material fact as to whether Ruggeri and Bayard are supervisors, to which Delaware Park has not responded. Delaware Park has thus not met its burden to show there is no dispute of material fact and that it is entitled to judgment as a matter of law on *respondeat superior* liability.

Ryan has evidence sufficient to prove each element of the hostile work environment claim based on hand touching, although not based on "black widow." Delaware Park's motion for summary judgment on the hostile work environment claim is denied.

## B. Retaliation

Title VII prohibits employers from "discriminat[ing] against" an employee because the employee "opposed any practice made an unlawful employment practice by [Title VII], or because [the employee] made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under [Title VII]." 42 U.S.C. § 2000e-3(a). This is known as the "anti-retaliation" provision. *See Babb v. Wilkie*, 589 U.S. 399, 411 (2020). To establish retaliation, Ryan must show "(1) that she engaged in protected employee activity; (2) adverse action by [Delaware Park] either after or contemporaneous with [Ryan's] protected activity; and (3) a causal connection between [Ryan's] protected activity and [Delaware Park's] adverse action." *Daniels v. Sch. Dist. of Phila.*, 776 F.3d 181, 193 (3d Cir. 2015) (cleaned up). If Ryan can prove those three elements, the burden shifts to Delaware Park "to present a legitimate, non-retaliatory reason for having taken the adverse action." *Id.* If Delaware Park does that, "the

burden shifts back to [Ryan] to demonstrate that [Delaware Park's] proffered explanation was false, and that retaliation was the real reason for the adverse employment action." *Id.*

### 1. Protected Employment Activity

Delaware Park does not contest that Ryan engaged in protected employment activity when she filed her 2021 Charge of Discrimination with the EEOC and complained to Delaware Park's Human Resources department about Ruggeri and Bayard. (D.I. 57 at 18; D.I. 64 at 6).

### 2. Adverse Action

To satisfy the adverse action requirement, Ryan "must show that a reasonable employee would have found the challenged action materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006) (internal quotations and citations omitted). This standard excludes "petty slights or minor annoyances that often take place at work and that all employees experience." *Id.*

Delaware Park argues Ryan's write-ups and Audit Notice led to no change in her employment status and had no detrimental effect that would dissuade a reasonable employee from complaining. (D.I. 57 at 18). Delaware Park argues there has been no change in Ryan's employment status, and she currently remains employed and in good standing. (*Id.* at 7).

Ryan argues all the corrective writings she received were written warnings that would dissuade a reasonable employee from complaining. (D.I. 60 at 13). Ryan focuses on three writings (Employee Counseling Notice,[2] Written Warning, and Advisory Note), arguing they

---

[2] The Employee Counseling Notice is marked as being a "verbal warning." (D.I. 60-1 at 57 of 66). Ryan argues the Notice is nonetheless a *de facto* written warning. (D.I. 60 at 13). I find that to be likely because the Notice is a writing memorializing the incident, and the "verbal warning" checked box seems to be nothing more than a label as part of a progressive warning structure.

12

stem from the same incident and, taken together, would have dissuaded a reasonable worker from making a discrimination charge. (*Id.*).

The Employee Counseling Notice, Written Warning, and Advisory Note all say that Ryan may be subject to "disciplinary action up to and including discharge" for future infractions. (D.I. 60-1 at 57 of 66; D.I. 59-1 at 50, 54 of 61).

"When a warning is part of a progressive disciplinary policy such that each previous infraction raises the penalty for a subsequent infraction, courts in the Third Circuit have classified it as an adverse employment action." *Allen v. Nutrisystem*, 2013 WL 1776440, at *6 n.6 (E.D. Pa. Apr. 25, 2013).[3] Ryan has sufficiently shown an adverse action. The writings issued to Ryan indicate she may be subject to further discipline for future infractions, up to her being fired. (D.I. 59-1 at 54 of 61). Hennefer testified that an employee's first infraction results in a verbal warning, the next in a first written warning, the next in a second written warning, the next in a "[final] written warning, after that up to a termination." (D.I. 60-1 at 27 of 66). I think, viewing the facts in the light most favorable to Ryan, a reasonable jury could determine that a reasonable employee would be dissuaded from engaging in protected activity after receiving three writings indicating they may be subject to further discipline, up to and including termination.

### 3. Causal Connection

I am to consider a "broad array of evidence" to determine if there is a causal connection between Ryan's protected activity and the adverse action. *Farrell v. Planters Lifesavers Co.*, 206 F.3d 271, 283–84 (3d Cir. 2000). Ryan may rely on temporal proximity if "unusually

---

[3] *Allen* discusses adverse actions under 42 U.S.C. § 1981, not 42 U.S.C. § 2000e-3(a), but both statutes bar retaliation and are evaluated under the same framework. *See Allen*, 2013 WL 1776440, at *4.

13

suggestive." *Daniels*, 776 F.3d at 196 (internal quotation and citation omitted). However, "it is causation, not temporal proximity itself, that is an element of [Ryan's] prima facie case, and temporal proximity merely provides an evidentiary basis from which an inference can be drawn." *Kachmar v. Sungard Data Sys.*, 109 F.3d 173, 178 (3d Cir. 1997). So,

> In the absence of such a close temporal proximity, [I must] consider the circumstances as a whole, including any intervening antagonism by the employer, inconsistencies in the reasons the employer gives for its adverse action, and any other evidence suggesting that the employer had a retaliatory animus when taking the adverse action.

*Daniels*, 776 F.3d at 196.

Ryan argues the causal connection requirement is met by the temporal proximity of Ryan's protected activity (her 2021 Charge of Discrimination)[4] and the adverse action. (D.I. 60 at 13–14). Delaware Park argues the timing is not "unduly suggestive" of retaliation. (D.I. 57 at 19).

Ryan received the Audit Notice twenty-two days after she filed her 2021 Charge of Discrimination. Ryan received the Written Warning thirty-seven days, and the Advisory Note thirty-eight days, after filing the 2021 Charge. Any inference of causation due to temporal proximity is quite moderate, if it exists at all. *See Dondero v. Lower Milford Twp.*, 5 F.4th 355, 361–62 (3d Cir. 2021); *Thomas v. Town of Hammonton*, 351 F.3d 108, 114 (3d Cir. 2003). The timing is not unduly suggestive. Any inference of causation is further belied by the circumstances as a whole.

---

[4] The parties discuss only the 2021 Charge of Discrimination as the protected activity for the causation element, likely because Ryan's complaint to human resources occurred six months before her first written warning. (*See* D.I. 59-1 at 19, 39 of 61). I too discuss only the 2021 Charge.

14

As for the Audit Notice, the writing was in direct response to a chip count discrepancy. Issuing the Audit Notice was consistent with how Delaware Park handles chip count discrepancies. (D.I. 57 at 6). The two other employees involved in the chip count discrepancy also received an Audit Notice. (*Id.*).

As for the Written Warning for disrupting Jiang's game, Ryan points out that she received a written warning while Jiang received a verbal warning. (D.I. 60 at 15). Ryan argues a jury may think the difference in discipline was based on retaliatory motive. (*Id.*). Ryan received a written warning, as opposed to a verbal warning, because she received a verbal warning earlier in the year for a different infraction (failing to properly call out of work). Issuing a written warning for Ryan's next infraction was Delaware Park's policy. (D.I. 64 at 8). Jiang received a verbal warning, which would be the appropriate level of discipline for a first infraction that warranted an Employee Counseling Notice.[5]

As for the Advisory Note, Ryan argues that a reasonable jury could conclude that the Note was motivated by retaliatory animus because Kelly never requested Ryan be disciplined. (D.I. 60 at 14–15). Delaware Park issued the Advisory Note in response to Ryan's disruptive behavior (which Ryan herself acknowledges), and in accordance with Delaware Park's policies. There is no reason Kelly had to request punishment for Delaware Park to issue Ryan an Advisory Note for disruptive behavior.

For the foregoing reasons, I think there is no causal connection between Ryan's protected activity and any adverse action. Delaware Park's motion for summary judgment on Ryan's retaliation claim is granted.

---

[5] Ryan does not allege that Jiang had a prior infraction.

## IV. CONCLUSION

An appropriate order will issue.